## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Richard K. Soyk, | ) | |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| Jo Anne B. Barnhart, | ) | Case No. 1:05-cv-097 |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Richard Soyk, seeks judicial review of the Social Security Commissioner's denial of his application for Disability Insurance Benefits ("DIB") under 216(I) and 223 of Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(I), 423.  Chief Judge Daniel L. Hovland has referred this matter to the undersigned for preliminary consideration.

## I.    BACKGROUND

### A.    Procedural History

Soyk initially filed his application for DIB benefits on February 4, 2003.  This claim was denied by the Social Security Administration ("SSA") on May 19, 2003, and again on reconsideration.  (Tr. 49-50, 55-57, 60-62).

Soyk requested a hearing in front of an administrative law judge ("ALJ") and a hearing was held before ALJ James Geyer on February 8, 2005.  (Tr. 419).  At the ALJ hearing, Soyk appeared with his attorney, as well as a Vocational Expert ("VE") and a Medical Expert ("ME").  (Tr. 419).  The ALJ issued a decision on March 31, 2005, that Soyk was not disabled within the meaning of the Act. (Tr. 25-39).  The Appeals Council denied Soyk's request to review the ALJ decision.  (Tr. 8-

10).  Soyk appealed to this court and the case is now ripe for consideration.

### B.      Background Evidence

Soyk was born on July 13, 1950, and was 54 years old at the time of the ALJ hearing.  (Tr.

426).  He has approximately a year and a half of college and a year and a half of vocational training

in electronics communications in addition to his high school diploma.  (Tr. 426-27).

Soyk served in the army from 1968-1971 as an aircraft electrician.  (Tr. 428-429).  Since his

discharge from the Army, Soyk has had roughly 20-30 jobs, including control technician, termite

inspector, laundry worker, mail clerk, fry cook, construction worker, bowling alley repairman, home

repairman, and has worked at an auto parts warehouse and at a retail business.  (Tr. 114, 158, 436-

444).  He claims he was fired from the laundry job because he could not fold the laundry fast

enough.  (Tr. 436).  He walked off the job from his employment at the retail establishment, which

was a silk screening store, because he was, according to Soyk, not given anything to do and because

he was to slow at it. (Tr. 438-39).  He was fired from his job in the auto parts warehouse for

inappropriate behavior.  (Tr. 440). Many of the other jobs he had to quit because he was to slow or

the physical nature of the job was to hard for him. (Tr. 444).

Soyk receives a disability check from the Veteran's Administration ("VA") of approximately

$2,000 per month.  (Tr. 430).

### a.      Medical Records

Soyk's application for DIB benefits alleged an inability to work since May 2002, due to post

traumatic stress disorder, epilepsy, tinnitus, otitis media, and residual effects of a skull fracture,

including headaches.  (Tr. 91-93, 113).

Soyk received a majority of his treatment from the VA hospital.  (Tr. 229).  On April 29,

2002, Soyk visited Dr. Michael Stewart, a Psychiatrist at the VA hospital, who diagnosed Soyk with having chronic Posttraumatic Stress Disorder ("PTSD"), major depression, panic disorder with agoraphobia, alcohol dependence that was in early complete remission, and pathological gambling. (Tr. 169). Dr. Stewart determined Soyk to be polite and cooperative, and having an affect that was reflective and "appeared mildly anxious and somewhat dysphoric." Id. Soyk's speech was fluent and he had well organized thoughts. Id. Soyk was ordered to continue with clonazepam, divalproex sodium and to start to use nefazodone to help with his depression and anxiety. Id. Soyk told Dr. Stewart that he was feeling anxious and depressed because of his upcoming court appearance for his alleged driving under the influence. (Tr. 168). Soyk said he would "go off crazy or sit in a corner and isolate" if he was sentenced to any term of imprisonment. Id. Dr. Stewart stated that Soyk had "very little motivation" and that he did "not have much energy." Id.

Soyk visited Dr. Stewart on May 20, 2002, and reported that he was doing "pretty decent" and that everything was "working out pretty well." (Tr. 167). Soyk told Dr. Stewart that he had completely abstained from alcohol since his recent DUI and that he denied having problems with depression. Id. Soyk described "his sleep and mood as both being good." Id. Dr. Stewart found Soyk to be polite and cooperative and had an affect that was "relaxed to bright" and that his speech was fluent with organized thoughts. Id. Dr. Stewart noted that Soyk was going to be let go from his position with the VA due to his "inability to keep up a good pace with his work." Id.

On his June 3, 2002, visit to Dr. Stewart, Soyk had just been laid off from the VA hospital because he failed to keep an adequate pace while working, but he told Dr. Stewart felt that he was doing quite well in spite of the fact he was dismissed from work. (Tr. 166). Soyk opined that he felt the "medication for his seizure disorder, as well as the nature of his seizure disorder itself, made it

3

somewhat difficult for him to keep up a high rate of work." Id.  Soyk said, however, that he felt that his work completion rate was adequate.  Id.  Dr. Stewart's assessment was chronic PTSD, major depression that was improved with medication, panic disorder with agoraphobia, seizure disorder, alcohol dependence that was in early complete remission, and pathological gambling that was in early remission.  Id.

Dr. Stewart's assessment of Soyk on July 1, 2002, included only chronic PTSD and seizure disorder that was treated with medication, without any mention of panic, alcohol, and gambling disorders.  (Tr. 165).  His affect was discouraged although not particularly dysphoric.  Id.  Soyk's antidepressant was increased from 100 m.g. of nefazodone a day to 100 m.g. of nafazodone in the morning and 200 m.g. at night.  (Tr. 165-66).  The doctor continued the Clonazepam and Trazodone at the current levels.  (Tr. 166).

On September 9, 2002, Soyk told Dr. Stewart that he continued to be unemployed and the forced idleness of the DWI conviction has "led him to a kind of lack of motivation recently." (Tr. 163).  He told the doctor that he had been applying for jobs, but that he has "not been as enthusiastic about this as he would like to be" and that he was having trouble motivating himself.  Id.  Dr. Stewart's assessment this time only included chronic PTSD.  Id.  On October 7, 2002, Soyk told Dr. Stewart that he was doing "fairly well overall" but that his confidence was shaken because of his experience of being fired from the VA.  Id.

Other VA records show that Soyk had problems with his hearing and his hearing aid but after a cleaning and a check-up the hearing aids worked to Soyk's satisfaction and the manufacturer's specifications.  (Tr. 227).  Tests showed his EEG was normal and that these results made it less likely that he was having epileptic spells.  (Tr. 228).  Gene Koob, of the VA's neurology department

did not rule out epileptic spells, however, and advised Soyk to stay on his medications and to keep his doctor appointments. <u>Id.</u>  Koob also stated that Soyk's lab test results were all normal and that the x-rays were normal or unchanged since his last exam.  <u>Id.</u>  An April 15, 2003, a report from Koob notes that Soyk experiences "brief blank spells" that are very momentary and happen maybe once a week.  (Tr. 230).

VA assessments indicated that Soyk was being treated for pain and that was not experiencing pain.  (Tr. 229, 233).  A summary of the active problems listed in the VA records included: Subjective tinnitus, sensorineureal hearing loss, mixed conductive and sensorineural hearing loss, hearing problems, pathological gambling, alcohol dependence, chronic sinusitis, seizure disorder, unspecified acquired hypothyroidism, and PTSD.  (Tr. 238-39, 241-42).

An examination from Dr. Chatree Wongjirad of St. Alexius PrimeCare showed that Soyk was physically well developed, well nourished, very pleasant, and showed  no signs of acute distress. (Tr. 246). A neurological examination revealed Soyk was alert and orientated with normal speech. (Tr. 247).  Soyk was able to "recall three words presented to him less than a minute earlier and he [was] able to 100 minus 7 fairly well." <u>Id.</u>  The doctor noted that Soyk was in a car accident that caused a close head injury that caused a loss of hearing in the right ear and that he "subsequently developed partial seizure for over 10 years and he [was] left with staring spell type seizures, most likely absence type seizures, which he had only 3-4 times a month" while taking Depakote. <u>Id.</u>  His neurological examination was within the normal limits.  <u>Id.</u>  The doctor noted that overall Soyk was doing fairly well.  <u>Id.</u>

VA records covering July 31, 2003, to August 25, 2004, shows Soyk suffered from PTSD, complex partial seizure disorder, bilateral hearing loss, chronic rhinosinusitis, and osteoarthritis in

his knees.  (Tr. 299).   However, his seizure problem was stable, and he was doing quite or reasonably well. (Tr. 299, 301). Soyk scored a 37 on a Burns Anxiety Inventory test, which puts him in the lower part of the sever anxiety range and a ZUNG mood disorder screening test suggested sever to extreme depression.  (Tr. 306-07, 308).

On June 4, 2006, Soyk was admitted to the St. Joseph's Hospital and Health Center's emergency room in Dickinson, North Dakota, after he was found unresponsive by his wife. (Tr. 321).  He arrived at the hospital in a "comatose" state and showed minimal response to pain.  Id. After several hours, Soyk slowly improved.  (Tr. 322).  Dr. Patricia Anderson examined Soyk and stated that aspects of the "examination were suspicious" and described him as "somewhat uncooperative."  (Tr. 325).  She stated for "instance when his arms [were] raised so that gravity would cause it to fall and strike his face, he was able to move, but otherwise did not respond."  Id. Dr. Anderson opined that at "no time was there any evidence of seizure activity."  Id.  Soyk underwent a CT scan of the head, which showed signs of his old injury but no acute changes were noticed and the rest of test came back normal.  Id.  Dr. Anderson's impression was that she suspected underlying psychiatric problems but was "not able to rule out a seizure and potential difficulty." (Tr. 326.).  It was later determined that he had about 12 beers during the prior day when he was with a group of friends.  (Tr. 332).

Psychiatric evaluations from the Badlands Human Service Center in Dickinson, North Dakota, between December 8, 2003, and April 22, 2004, showed that Soyk initially had some adjustment issues in relocating to Dickinson but that he made some headway in developing a social support system after living there for a while. (Tr. 276-94).  As part of his treatment for PTSD, he was required to make psychiatric appointments every two or three months with Dr. Renee

Boomgaarden. (Tr. 284).

Dr. Boomgaarden described Soyk's lifestyle habits as poor and that she felt that his addictions, relating to alcohol and gambling, were at high risk for spiraling out of control unless he made some changes immediately. (Tr. 283). On several occasions, Dr. Boomgaarden smelled alcohol emanating from Soyk. (Tr. 282, 283). By his April 22, 2004, visit with Dr. Boomgaarden, Soyk realized that the busier he was the less likely his addictions were going to spiral out of control. Id.

On February 24, 2004, Soyk was evaluated by psychiatrist Dr. Leonard Conradson of the Badlands Human Service Center. Dr. Conradson's mental examination of Soyk revealed that Soyk was alert and oriented, friendly and cooperative, and that his affect was reactive and his mood was one of only mild anxiety. (Tr. 280). His cognitive skills were "generally intact with good memory for immediate recent and remote events" and he had the ability to concentrate. Id. His judgment and insight were reasonable, but his choices relative to his ongoing alcohol use was poor. Id. Dr. Conradson's diagnosis was PTSD, alcohol dependence, seizure disorder, and stress related to his under-employment and his legal problems. Id. Soyk's Global Assessment of Functioning ("GAF") score was 55.[1]

In a letter dated October 4, 2004, to Soyk's attorneys whom were handling his social security benefits application, Dr. Conradson diagnosed Soyk as having PTSD, Cognitive Disorder NOS,

---

[1] "According to the Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.' GAF scores of 41 to 50 reflect '[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).' Manual at 34. GAF scores of 51-60 indicate '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'" Hudson v. Barnhart, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).

which was secondary to brain injury and alcohol dependence, Personality Disorder, seizures, social/environmental/economic problems, and a GAF of 50.  (Tr. 395-96.).  In an impairment questionnaire, Dr. Conradson identified poor memory, sleep disturbance, personality change, substance dependence, and difficulty thinking or concentrating as clinical findings that demonstrate and support his diagnosis.  (Tr. 398).  Dr. Conradson categorized Soyk's ability to understand and remember detailed instructions, carry out detailed instructions, perform activities within a schedule and maintain regular attendance, complete a normal workweek without interruptions from psychologically based symptoms, and get along with co-workers or peers without distracting them as markedly limited.  (Tr. 400-402).  Soyk's understanding, memory, sustained concentration and persistence, social interaction, and adaptation skills were considered mildly to moderately limited.  Id.  In a "To Whom it May Concern" letter, Dr. Conradson wrote that Soyk was totally disabled without consideration of any past or present drug and/or alcohol use.  (Tr. 405).

The results from a neuropsychological test conducted by Dr. Rodney Swenson showed that Soyk's general cognition was in the average range and that he was oriented in all spheres.  (Tr. 410).  His mental control testing "was within normal limits for both automatized and nonautomatized tasks."  Id.  "His performance on the Trail-Making Subtests were acceptable, although he was somewhat tremulous."  Id.  He had no trouble on the Stroop Test and on the Wisconsin Card-Sorting Test, which "he achieved 5 categories in a single deck of cards, making only 7 preservative errors out of a total of 10."  Id.  "His Picture Arrangement performance, which is a test of nonverbal sequencing, was scored quite well at the 91st percentile rank."  Id.  Soyk's "executive functioning testing for the most part is done quite well."  (Tr. 412).  "His performance with respect to language and spatial functions [were] normal."  Id.  Dr. Swenson determined that despite having some

difficulties with his verbal memory, with retrieval strategies Soyk's performance could be brought up to 100%. Id. Overall, Soyk functioned at a fairly high level intellectually and despite his active drinking and medication use, Dr. Swenson was "struck by the amount of neuropsychological strengths that are within his protocol." (Tr. 412). His emotional testing using the Beck Depression Inventory, however, showed he was near the severe range. (Tr. 413).

A seizures and impairment questionnaire filled out by Dr. Maria Dongas, a Neurologist from the Fargo VA who had seen Soyk one time, indicated that Soyk had complex partial seizures with occasional secondary generalization that was poorly or inadequately controlled. (Tr. 389). Dr. Dongas found that Soyk lost consciousness as a result of the seizures and that this happened once per month for about five minutes. (Tr. 390). She explained that alcohol use, inadequate sleep, and fatigue may be precipitating factors that may cause such a seizure. Id. Dr. Dongas stated Soyk experienced postictal manifestations of drowsiness, confusion, combativeness, and agitation, which lasted for a few hours. (Tr. 391). She opined that Soyk could not work at heights, operate machines that require an alert operator, or operate a motor vehicle. She estimated that Soyk would be absent from work more than three times a month and take one to two fifteen to thirty minute breaks during the work day. (Tr. 393).

A psychiatric review technique form completed by a Disability Determination Service examiner, found that Soyk had impairments that were not severe based on his affective disorders, anxiety-related disorders, and substance addictions disorders. (Tr. 203-04). His degree of functional limitation ranged from none to mild. (Tr. 214, 272). The examiner determined that Soyk was "able to pay attention to his work" and that he worked at one pace and that his production level was low but satisfactorily completed. (Tr. 216).

9

Soyk's Mental Residual Functional Capacity Assessment ("RFC") showed his understanding and memory, sustained concentration and persistence, social interaction, and adaption was primarily not significantly limited with only a few exceptions that showed he was moderately limited. (Tr. 257-58).

Soyk's Physical RFC showed he had no exertional, manipulative, visual, and communicative limitations. (Tr. 219-22). The only limitations he had was that he should never climb or be around hazards such as machinery and heights. Id.

**b.   Hearing before the ALJ**

The hearing before the ALJ was held on February 8, 2005. Soyk appeared in person with his wife, Pat Soyk, along with his attorney, Matthew Edwards. (Tr. 419, 421). Also appearing at the hearing was Richard Ostrander, a vocational expert, and Dr. Mark Hanlon, a medical expert. Id. Administrative Law Judge James Geyer conducted the hearing. Id.

When asked why he believed he was disabled, Soyk responded:

> I just - because of my - the - I don't know. Can I give you an example of, like, if - my boss or the employer would tell me, you know, to do something - that I was doing something wrong, I would - you know, that would be with me for days afterwards? You know, I'd get - would keep putting myself down for not being able to do things right and being stupid and that, you know expecially, like the laundry job. I had fellows - I would have these - what they - I now know were absent seizures, where I would just all of a sudden be standing there and staring, and not knowing what was - that I was doing it. And my supervisor would see that and he thought I was just daydreaming, and he would berate me for that and call me names at times. And then I didn't get along with the other workers, and just - other jobs I've had, I've had problems getting along with the people I worked with.

(Tr. 429-30).

Soyk said he had a hard time handling his money so his wife balances the checkbook. (Tr. 430). He said he would spend money on nonsensical things like having portraits taken of himself

and gambling.  Id.  He testified that he would, at times, spend his whole working paycheck per month on gambling, which was about $600 per month.  Id.

Soyk testified that he helped his wife with her business by entering numbers into the computer.  (Tr. 431-32).  He took a Vocation Rehabilitation course through the VA where he studied internet web design.  (Tr. 432).  He claims he could not complete the course because it was to complicated for him but that he was trying a different course as of the date of the hearing.  Id.

The ALJ asked Soyk if he was taking any prescribed medicine.  (Tr. 433).  Soyk responded that he was taking clonazepam, divalproex, lamotrigine, and trazodone.[2]  (Tr. 155, 434).  He said the lamotrigine helped a lot in controlling his seizures.  Id.  Soyk testified it had been several years since he last had a grand mal seizure.  (Tr. 434).  He said he has not had a petit mal seizure since he started taking his seizure medication.  Id.  He opined that he took his medication as prescribed and was able to take them himself.  (Tr. 435).  He claims the medicine that he takes "cloud" his thinking and causes him to have trouble concentrating and describing a thought.  Id.

Soyk testified that he was fired from his last job as a laundry worker because he could not do it quickly enough, but stated that if he could do it at his own pace, it would "be different." (Tr. 436).  The ALJ asked Soyk about his other previous employment as a pest control technician, auto parts warehouse worker, shipping and receiving clerk, bowling alley repairman, fry cook, and construction worker.  (Tr. 436-43).  Soyk responded the pest control technician job would be hard on his knees and that he walked off the shipping and receiving clerk position because he was frustrated with the lack of opportunity and because he was too slow. (Tr. 438-39).  He said he was

---

[2] Clonazepam is used to treat panic disorder and petit mal seizures.  Divalproex treats epilepsy, lamotrigine treats partial onset seizures, and trazodone is an antidepressant.  Physicians' Desk Reference, (2006); Dorlands's Illustrated Medical Dictionary (27th ed. 1988).

11

fired from the parts warehouse because he would forget to get orders and argued with management. (Tr. 440-41). The one job he thought, however, he could still do was a bowling alley repairman if he could find an alley that was not fully computerized. (Tr. 442-43).

When asked what he did around the house, Soyk responded that he did the vacuuming, cooking, dishes, and grocery shopping. (Tr. 449). He said he spends approximately six hours per day on the computer with frequent breaks. (Tr. 450).

Dr. Hanlon, the ME, testified that Soyk suffered from anxiety disorder with less than severe panic disorder and substance addition disorder. (Tr. 476). Dr. Hanlon opined that Soyk's daily activities would be restricted mildly, his social functioning was mild to moderate, and concentration, persistence, and pace would be moderate to marked by his cognitive abilities. (Tr. 480). Dr. Hanlon believed Soyk had the ability to understand and remember at least three and four step routine instructions. Id. According to Dr. Hanlon, Soyk could carry out instructions with reasonable persistence and pace in the short term, but he was unsure about Soyk's ability to maintain the activity over the long term. Id. Dr. Hanlon said that Soyk could tolerate superficial contact with workers and ordinary levels of supervision in the short run. Id. He was, however, concerned that Soyk had a combination of problems and had not held a job consistently for a substantial amount of time. (Tr. 482).

Mr. Rick Ostrander, the VE, testified that, assuming Soyk's testimony was fully credible, Soyk could not preform any of his past relevant work because of his inability to focus on his work task due to decreased concentration and attention, deep depression, and panic attacks. (Tr. 494-95). Mr. Ostrander testified Soyk possessed transferable skills that are applicable to sedentary work, especially light-duty work. (Tr. 495). Mr. Ostrander stated that Soyk's experience as a parts clerk

has transferable skills to other retail sales jobs of a lower skill level, such as retail salesperson. Id.

The VE testified that Soyk's pest control work experience was transferable to "light duty pest

control workers as existed in the regional and national economy." (Tr. 496).

The ALJ posed a second hypothetical to the VE that stated:

[A]ssume an individual the Claimant's age, education, and past relevant work experience. Assume an individual with all the impairments described by the Claimant at this hearing. For limitations, I want to first assume the FCA form at 6F[3], and the DDS doctor there indicated there were no exertional limitations established. Ladders, ropes, and scaffolds were "never." He had – needs a hearing aid, at least for the right ear. They indicate the left ear is okay. And he should avoid concentrated exposure to hazards and machinery, heights, et cetera. Also assume the limitations described by Dr. Hanlon, and for this hypothetical, assume that he has the ability to carry out three and four-step routine instructions with reasonable persistence and pace. Would that individual be able to perform any of Claimant's past relevant work?

(Tr. 496).

The VE responded:

It's really a close question, Your Honor. The exertional limitations, obviously, I don't think interfere, nor do the environmental limitations, in terms of ladders or hazards, to speak of. The key issue with Dr. Hanlon's testimony is that his ability to be a consistent persistence and pace is moderate to marked, so we're right on the borderline. I would think that's going to interfere with occupations that have some production quota or timeliness quota, such as perhaps the laundry work or the warehouse work, or even the construction work. On the other hand, there are some construction jobs an individual can do, which are more job-dependent, and so that wouldn't be as important. Likewise, the pest control worker position may not be as important. By definition, if you have a moderate impairment in consistency, persistence, and pace, it's not as – so much as to preclude the occupation, whereas if you have a marked impairment, it would. So he's right in between that. . . . . . So I would say, you know, depending on which way you fall on that, he could return to the past work as a pest control worker or perhaps some types of construction jobs, construction laborer.

(Tr. 496-97).

---

[3] The FCA form is the physical RFC assessment form located in the transcript on pages 249-56.

The ALJ asked the VE if there were other jobs an individual could do.  (Tr. 497).  The VE stated that there were and occupations that paid by the job would be the best.  Id.  Those jobs include "cleaner, industrial or cleaner, housekeeping, DOT number 323.687-014, and 381.687-018."[4]  Id. The VE testified that in North Dakota there were roughly 10,000 position for the DOT positions consisting of 3,100 housekeeping cleaners and 6,400 industrial cleaner positions.  Id.

The ALJ's third hypothetical asked the VE to assume the same scenario as hypothetical number two but for the limitations in physical RFC with the ability to do routine repetitive and simple work activity with moderately limited ability to accept instructions appropriately and criticism from supervisors.  (Tr. 497-98).    The VE stated under this hypothetical the individual could be a laundry laborer, warehouse worker, fry cook, cleaner, industrial cleaner, housekeeper, agricultural produce sorter, and various production jobs.  (Tr. 498-99).

### c.    ALJ Decision

On March 31, 2005, the ALJ issued his written opinion denying Soyk social security benefits.  (Tr. 39).  The ALJ identified status post traumatic brain injury, PTSD, posttraumatic seizure disorder, tinnitus in the right ear, osteoarthritis in the knee, and alcohol dependance as Soyk's impairments.  (Tr. 30).  The ALJ concluded these impairments were severe but were not severe "enough to meet or medically equal, either singly or in combination to one of impairments listed in Appendix 1, Subpart P, Regulations No. 4."  Id.  As to Soyk's mental limitations, the ALJ stated Soyk had mild restriction in activities of daily living, "mild to moderate difficulty in maintaining social functioning, and moderate to marked difficulty in maintaining concentration,

---

[4] DOT stands for Dictionary of Occupational Titles.  DOT number 323.687-014 identifies cleaner, housekeeping (any industry).  Dictionary of Occupational Titles available at http://www.occupationalinfo.org.  DOT position 381.687-018 is a cleaner, industrial (any industry).  Id.

persistence and pace."  Id.  The ALJ concluded that Soyk did not meet the "B" and "C" criteria set forth in section 12.06.[5]

The ALJ stated that he did not give great weight to the opinion of Dr. Maria Dongas because she saw Soyk only once, and he believed her findings were not supported by the record.  (Tr. 32). He also gave little weight to Dr. Conradson's findings on the grounds they were inconsistent with the Soyk's medical records and daily living.  (Tr. 33).  Specifically, the ALJ questioned Dr. Conradson's assertion that alcohol is not a material cause of Soyk's disability without explanation. Id.  He also took issue with Dr. Conradson's statements that Soyk is disabled but at the same time has given him only moderate symptoms.  Id.

The ALJ considered the determination by the VA that Soyk was disabled.  (Tr. 35).  He noted, however, that the VA's determination was not binding on the ALJ's decision.  Id.  He stated that the VA determined Soyk was "100% disabled due to his post traumatic stress disorder."  Id. "His grand mal epilepsy is considered 20% disabling; tinnitus is 10% disabling; suppurative otitis media is 10% disabling; basilar skull fracture as 10% disability; bilateral maxillary sinusitis is 10% disabling and hearing loss as 0% disabling."  Id.

The ALJ found the medical records and Soyk's testimony were not consistent with the VA's PTSD finding. (Tr. 35).  The ALJ opined that Soyk's condition had actually improved since the alleged onset date.  Id.  As support for his conclusion, the ALJ pointed out that since his onset date Soyk had gotten married, goes to church and Bible study, shops, walks in the mall, watches

---

[5] "B" requires at least two of the following: 1) Marked restriction of activities of daily living; or 2) Marked difficulties in maintaining social functioning; or 3) Marked difficulties in maintaining concentration, persistence, or pace; or 4) Repeated episodes of decompensation, each of extended duration.  20 C.F.R. pt. 404, Subt. P, App. 1 at 12.06(B).  "C" is the resulting "in complete inability to function independently outside the area of one's home."  Id. at 12.06(C).

television, goes to the casino, and spends significant time on the internet.  Id.

The ALJ noted that Soyk's alleged onset date is consistent with the date that he was approved for VA benefits.  (Tr. 35).  Soyk had not looked for employment since his alleged onset date and had good earnings the year prior to his VA disability finding.  Id.  The ALJ opined that Soyk did not provide a satisfactory reason why his limitations increased in 2002 other than the fact he started to receive 100% disability from the VA.  Id.

The ALJ accepted the finding of the non-examining physicians as to Soyk's physical limitations, but not his mental limitations.  (Tr. 36).  The ALJ found that Soyk showed changes in his mental limitations since the review by the non-examining physicians.  Id.  ALJ concluded Soyk had the "following residual functional capacity: no exertional, manipulative, communicative, or environmental limitations other than the claimant should never climb ladders/ropes/scaffolds, avoid concentrated exposure to hazards, machinery, heights, etc., and needs a hearing aide in his right ear. The claimant has the ability to carry out 3-4 step instructions with reasonable persistence and pace. He can tolerate brief and superficial contact with coworkers, supervisors and the public.  He can also handle normal job stressors."  Id.

The ALJ applied Soyk's residual functional capacity findings to the Social Security guidelines and found that Soyk was not able to perform any of his past relevant work.   Id. Considering Soyk's age, educational background, work experience, and residual functional capacity, the ALJ found Soyk was capable of making a successful adjustment to work that exists in significant numbers in the national economy and therefore was not under a disability within the meaning of the Social Security Act.  (Tr. 37).

16

## II.     APPLICABLE LAW

### A.     <u>Standard of review</u>

The scope of this court's review is limited in that it is not permitted to conduct a *de novo* review.  Rather, the court looks at the record as a whole to determine whether the Commissioner's decision is supported by substantial evidence. <u>Ellis v. Barnhart</u>, 392 F.3d 988, 993 (8th Cir. 2005).

Substantial evidence is less than a preponderance, but more than a scintilla of evidence. <u>Nelson v. Sullivan</u>, 966 F.2d 363, 366 n.6 (8th Cir. 1992); <u>Robinson v. Sullivan</u>, 956 F.2d 836, 838 (8th Cir. 1992).   It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Nelson v. Sullivan</u>, 966 F.2d at 366 n.6 (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results.  <u>Culbertson v. Shalala</u>, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." <u>Id.</u>   Consequently, the court is required to affirm a Commissioner's decision that is supported by substantial evidence - even when the court would weigh the evidence differently and reach an opposite conclusion.  <u>Id.</u>

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole.  <u>See</u> <u>Haggard v. Apfel</u>, 175 F.3d 591, 594 (8th Cir. 1999); <u>Brockman v. Sullivan</u>, 987 F.2d 1344, 1346 (8th Cir. 1993).  The Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide." <u>Anderson v.</u>

Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner.  The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner.  Ellis v. Barnhart, 392 F.3d at 993.

### B.      Law governing eligibility for adult benefits

"To be eligible for disability insurance benefits, a claimant has the burden of establishing the existence of a disability under the Social Security Act ("Act").  42 U.S.C. § 423(a)(1)(D).  To meet this burden to receive SSI benefits, the claimant must show: (1) a medically determinable physical or mental impairment that has lasted, or can be expected to last, for not less than twelve months; (2) an inability to engage in any substantial gainful activity; and (3) that this inability results from the impairment.  42 U.S.C. § 423(d)(1)(A)."  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

"Substantial gainful activity" under the Act includes any substantial gainful work that exists in the national economy, regardless of (1) whether such work exists in the immediate area in which the claimant lives, (2) whether a specific job vacancy exists for the claimant, or (3) whether the claimant would be hired if he or she applied for work.  42 U.S.C. § 423(d)(2)(A).  Work available in the national economy with respect to a particular person means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  Id.

In deciding whether a claimant is disabled within the meaning of the Act,  the ALJ is required to use the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520 and determine:

(1)      whether the claimant is presently engaged in a substantial gainful activity,

(2)     whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

(3)     whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

(4)     whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5)     if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

If the ALJ reaches the fourth step, the ALJ must determine a claimant's residual functional capacity ("RFC"), which is what the claimant can do despite his or her limitations.  20 C.F.R. § 404.1545.  The ALJ is required to make the RFC determination based on all relevant evidence, including, particularly, any observations of treating physicians and the claimant's own subjective complaints and descriptions of his or her limitations.  Pearsall v. Massanari, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions."  Id.  In this circuit, these are referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).[6]  E.g., Ellis v. Barnhart, 392 F.3d at 993-996.   Claimant's subjective

_____

[6]  In Polaski, the Eighth Circuit stated the following with respect to the manner in which subjective pain complaints are to be analyzed:

A claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment . . . .While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.

complaints may be discounted only if found to be inconsistent with the record taken as a whole.

Pearsall v. Massanari, 274 F.3d at 1218.

Also, the ALJ must give controlling weight to medical opinions of treating physicians that are supported by accepted diagnostic techniques and that are not inconsistent with other substantial evidence.  This rule does not apply, however, to opinions regarding disability or inability to work because these determinations are within the exclusive province of the Commissioner.  The Eighth Circuit has summarized the relevant rules regarding treating physician opinions as follows:

> Generally, an ALJ is obliged to give controlling weight to a treating physician's medical opinions that are supported by the record. See Randolph v. Barnhart, 386 F.3d 835, 839 (8th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). A medical source opinion that an applicant is "disabled" or "unable to work," however, involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight. See Stormo [v. Barnhart], 377 F.3d [801, 806 (8th Cir. 2004)] ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." (internal marks omitted)); 20 C.F.R. § 404.1527(e)(1). Further, although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner. See 20 C.F.R. § 404.1527(e)(2).
> . . . .
> The Commissioner defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. § 404.1527(a)(2). "A treating physician's opinion is

---

The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
1. the claimant's daily activities;
2. the duration, frequency and intensity of the pain;
3. precipitating and aggravating factors;
4. dosage, effectiveness and side effects of medication; and
5. functional restrictions.
The adjudicator is not free to accept or reject the claimant's subjective complaints.

739 F.2d at 1321-22.  The Polaski factors are now embodied in 20 C.F.R. § 404.1529.

due 'controlling weight' if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 ([8th Cir.] 2000)).

Ellis v. Barnhart, 392 F.3d at 994-995.

Disability determinations made by others, while relevant evidence, are not controlling upon the Commissioner. The Commissioner is charged with making her own disability determination based upon the criteria set forth in the Social Security law. 20 C.F.R. § 404.1504. E.g., Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996). And, if the ALJ proceeds to the fifth step, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. Pearsall v. Massanari, 274 F.3d at 1217.

## III.   ANALYSIS AND DISCUSSION

### A.   Failure to Properly Evaluate the Medical Evidence

Soyk argues the ALJ improperly discounted the opinions of Dr. Conradson and Dr. Dongas. Soyk claims the ALJ did not give the proper weight to Dr. Conradson, whom Soyk argues is a treating source. Soyk argues the ALJ incorrectly opined that Dr. Conradson stated that Soyk had only moderate symptoms. He also asserts that the ALJ merely speculated that Dr. Conradson had not reviewed the medical records.

The ALJ appears to have discounted Dr. Conradson's opinion because of the reaching statement that Soyk is totally disabled without consideration of the drug and/or alcohol use. He also notes that Dr. Conradson alleged Soyk had been limited since 1970, but points out that Soyk's earnings records refutes that statement and calls the remainder of Dr. Conradson's opinion into question. The ALJ contrasts Dr. Conradson's opinion with Dr. Boomgaarden's records to show the discrepancy of the treatment given by two doctors with regard to Soyk's alcohol problem.

According to the records, Dr. Boomgaarden saw Soyk at least five time and Dr. Conradson twice. (Tr. 276-297). Dr. Boomgaarden saw Soyk on a monthly or twice monthly basis to monitor his PTSD symptoms and to help him use his coping skills to resolve his problems. (Tr. 284, 395). She is the person who referred Soyk to Dr. Conradson. Id.

When a treating source's opinion is not given controlling weight, the Commissioner uses the following factors in deciding the weight given to any medical opinion: 1) Examining relationship; 2) Treatment relationship that includes length of the treatment relationship and the frequency of examination and the nature and extent of the treatment relationship, 3) Supportability, 4) Consistency, 5) Specialization, and 6) any other factors. 20 C.F.R. § 404.1527.

Even assuming Dr. Boomgaarden's opinions should not given controlling weight despite the fact she more often saw Soyk over a longer temporal proximity than did Dr. Conradson, the ALJ was proper to give her medical opinion greater weight under the aforementioned factors. Her medical opinions are consistent and supported by the record as a whole. There is ample evidence in the record to show Soyk was alert, oriented, and demonstrated well ordered thoughts. (Tr. 280, 287). Records indicate Soyk had normal fluent speech, intact language, normal thought process, normal thought content, normal gait and station, normal deep tendon reflexes, and a normal EEG. (Tr. 159-151, 228, 300, 313-336).

Dr. Boomgaarden's opinions are also supported by the findings of Dr. Swenson. Dr. Swenson's neuropsychological consultation was supplemented to the record after the ALJ hearing. During the ALJ hearing, the ALJ asked Soyk's attorney for Dr. Swenson's report. Soyk's attorney was not able to furnish the report at the time of the hearing, so the ALJ left the record open until the report was provided. (Tr. 425). The report was later added to the record and considered by the ALJ.

22

(Tr. 18, 31, 406). Dr. Swenson's report showed that Soyk functioned at a fairly high intellectual level and with the normal range of verbal cognition. (Tr. 412). Dr. Swenson also found Soyk performed quite highly from a cognitive standpoint. Id. Soyk denied any problems with sleep or appetite and claimed he did not have any problem with energy and that his mood was generally fair. (Tr. 408). Dr. Swenson stated that given the fact Soyk was still actively drinking and on medications he was "struck by the amount of neuropsychological strengths" that were within Soyk's control. (Tr. 412). These findings corroborate Dr. Boomgaarden's conclusions.

In contrast, Dr. Conradson appears to even contradict himself. On February 24, 2004, Dr. Conradson said Soyk was alert, orientated, friendly, cooperative, and that his affect was reactive and his mood was one of only mild anxiety. (Tr. 280). He also stated that Soyk's cognitive skills were "generally intact with good memory for immediate recent and remote events" and that he had the ability to concentrate. Id. This is in stark contrast to Dr. Conradson's assertions in his letter to Soyk's attorneys that stated Soyk has poor memory, personality change, and difficulty thinking or concentrating. (Tr. 398). The ALJ did not err in discounting Dr. Conradson's later conclusions.

Soyk also argues that the ALJ "failed to accord great weight to the opinions of Dr. Dongas. . . ." Again, the ALJ did not err in not according great weight to the opinions of Dr. Dongas because she examined Soyk only once. (Tr. 389). As stated before, there is a plethora of evidence to support the ALJ's conclusion that Dr. Dongas's assessment that Soyk had frequent seizures that caused a loss of consciousness and that his seizures were poorly controlled for many years were against the weight of the evidence and even Soyk's own testimony. Soyk testified that the medicine helped him a lot in controlling his seizures and that he had not had a grand mal seizure in "quite a while" and that he had not had a petit mal seizure since starting his medication. (Tr. 434). Soyk's testimony

23

itself lends credibility to the ALJ's discrediting of Dr. Dongas's medical opinion.

Soyk argues the VA's finding that he is 100% disabled is inconsistent with the ALJ finding. Soyk opines that a VA's finding of disability deserves explicit attention and is entitled to some weight by the ALJ. Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998). An ALJ, however, is not "bound by the disability rating of another agency when he [or she] is evaluating whether the claimant is disabled for purposes of social security benefits." Pelkey v. Barnhart, 433 F.3d 575, 579 (8th Cir. 2006); Morrison v. Apfel, 146 F.3d at 628. In Pelkey, the Eighth Circuit concluded the ALJ did not err in denying the claimant disability despite the fact the VA found the claimant disabled because the ALJ fully considered the evidence underlying the VA's conclusion. Id.

In the case at bar, the ALJ fully considered the VA's determination that Soyk was disabled. (Tr. 35). The ALJ methodically considered the percentages of disability attributed to each impairment by the VA to Soyk and weighed its findings against the medical evidence and testimony. The ALJ found Soyk's residual effects of the PTSD had improved since Soyk's alleged onset date. The ALJ stated that the "medical records and the claimant's testimony" do not reflect the level of impairment found by the VA. (Tr. 35).

Because the ALJ fully considered the evidence underlying the VA's final conclusion and weighed it against the medical evidence and Soyk's testimony, the ALJ did not err in making a contrary conclusion to the VA's determination of disability.

Soyk is an individual who is closely approaching advanced age under the guidelines.[7] He was 54 years old at the time of the ALJ decision. The ALJ recognized that Soyk was defined as an

---

[7] A person is defined as an individual who is approaching advanced age if he or she is between 50-54 years old. When a person is approaching advanced age, the SSA considers the claimant's age, along with a severe impairment and limited work experience, may seriously affect the claimant's ability to adjust to other work. 20 C.F.R. 416.963(d).

individual approaching advanced age.  (Tr. 37-38).  The ALJ opined the VE testified that Soyk has more than a high school education and has "transferable skills to light work from his retail background to a SVP 3 level."[8]  Id. see also (Tr. 495).

Soyk does not argue that the ALJ improperly considered his age and the transferability of his skills to other occupations.  The ALJ considered Soyk's age, work experience, and the VE's testimony and determine that Soyk's skills were transferable from his retail job to a SVP 3 level.  This determination is well supported by the VE's testimony that Soyk has experience that is classified as a SVP 5.  (Tr. 495).  The ALJ did not err in using a SVP level of 3 to use with Soyk's age to determine if there were any skills transferable from his previous work experience.  See Fines v. Apfel, 149 F.3d 893, 895 (8th Cir. 1998).

**B.      The ALJ's Hypothetical to the VE**

Soyk argues the VE's testimony was not substantial evidence that Soyk could perform other substantial gainful activity because the ALJ's RFC assessment was not supported by substantial evidence.  Citing Ross v. Apfel, 218 F.3d 844, 850 (8th Cir. 2000).  Soyk also opines the ALJ failed to mention the favorable testimony from the VE and failed to give a hypothetical that included marked limitations in consistency, persistence, and pace.

Soyk's argument that the ALJ's RFC assessment was not supported by substantial evidence is misplaced.  Soyk alleges the ALJ failed to address the ME's findings that Soyk could carry out a three to four step routine instructions with a reasonable persistence and pace for only a short term.  Soyk's characterization of the ME's testimony, however, is misleading.  The complete relevant

---

[8] An SVP is defined as specific vocational preparation time.  Fines v. Apfel, 149 F.3d 893, 895 (8th Cir. 1998).  "An SVP level of 'three' indicates that a job requires more than on month and up to three months of training . . . ." Id.

testimony was:

> [ALJ]:  Okay. In your opinion, does he have the ability to understand and
> remember at least three and four-step routine instructions?
> [ME]:  Yes.
> [ALJ]:  Can he carry out those instructions with reasonable persistence and
> pace?
> [ME]:  I think, in the short term.  The question about the long-term is I don't
> know.  He has also demonstrated some inability, in recent years, to
> keep a job, and that seems to be related to his inability to work fast
> enough, and also his distracting other workers, talking with them,
> things like that. . . . .

(Tr. 480-81).

The ME testified that he did not know if Soyk could carry out instructions with reasonable

persistence and pace in the long term.  Contrary to Soyk's assertion, one of the ALJ's hypotheticals

did contemplate a marked limitations in consistency, persistence, and pace and did ask the VE

questions based upon treating physician limitations.    In the ALJ's first hypothetical, he asked the

VE to assume Soyk's testimony was fully credible and to assume Dr. Hanlon's testimony about

consistency, persistence, and pace.  (Tr. 496).  The VE responded, even considering Dr. Hanlon's

assessment that Soyk suffered from marked limitations in consistency, persistence, and pace he

concluded there were still some jobs a claimant could do such as some construction jobs and pest

control worker.  (Tr. 496-97).  Soyk's attorney even asked the VE whether a markedly limitation

to carry out detailed instructions would eliminate any of these jobs.  (Tr. 501).  The VE responded,

"No. They're all unskilled jobs that would not require detailed instructions."  Id.  In fact, an RFC

completed by Dr. Hase indicated that Soyk was not significantly limited in his abilities to carry out

short, simple instructions, perform activities within a schedule, and perform at a consistent pace

without an unreasonable number of length of rest periods.  (Tr. 257-258).  Dr. Hase found Soyk had

moderate limitations in his ability to maintain attention and concentration for extended periods.  Id.

"A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001). "The hypothetical question must capture the concrete consequences of the claimant's deficiencies." Id. "Likewise the ALJ may exclude any alleged impairments that she [or he] has properly rejected as untrue or unsubstantiated." Id.

After reviewing the medical record and the hypotheticals posed by the ALJ, the undersigned concludes the hypotheticals set forth the proper impairments supported by the substantial evidence in the record. Between the three different hypotheticals posed by the ALJ, he sufficiently captured the claimant's deficiencies by posing varying fact scenarios that reflected the medical evidence, one even assuming full credibility of Soyk's own testimony.

### C.      Credibility of Soyk's testimony

Soyk argues the ALJ erred in concluding his allegations regarding his limitations were not totally credible.      In the ALJ's findings, the ALJ stated he "finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision." (Tr. 38).

The ALJ can determine a claimant's credibility. See Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) (stating an ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole); Randolph v. Barnhart, 386 F.3d 835 (8th Cir.2004).

In this case, the ALJ does not extensively discredit Soyk's credibility in his evaluation of the evidence.   In evaluating Soyk's alleged memory problems, the ALJ implicitly disputed the contention that Soyk's memory problems significantly contributed to his disability.  The ALJ cited Dr. Swenson's report that stated Soyk is an individual, despite his brain injury, who functions at a

27

"fairly high level intellectually." (Tr. 31, 412). Dr. Swenson opined that Soyk had some relative weakness with his verbal cognition but still was generally in the average range. Id. As for his memory, Dr. Swenson said Soyk had some difficulties with his verbal memory, but with "retrieval strategies or cueing strategies, his performance can be brought up to 100%." Id.

Soyk alleges the ALJ improperly drew an inference at the hearing that Soyk's onset date was suspicious because it was the same time Soyk was determined to be 100% disabled by the VA. (Tr. 491). The ALJ asked Soyk if something had changed in 2002 since in 2001 he had earned $23,536 from other sources before receiving his VA benefits. Id. Soyk admitted that he has not looked for any jobs since he was diagnosed as 100% disabled by the VA in May of 2002. (Tr. 433). Soyk alleges the ALJ drew an adverse credibility determination from this line of questioning, but the ALJ, however, did not mention this as a credibility issue in his opinion. In any event, the ALJ can consider prior earnings history and other factors that may demonstrate a person's motivation to seek employment.

This case involves a plethora of doctors and varying diagnoses. The ALJ considered the evidence and weighed the opinions of the doctor that had primarily examined Soyk, especially the findings of Dr. Boomgaarden. (Tr. 32-33). As to the credibility of Soyk's assertion that he was disabled, the ALJ considered the medical evidence and even Soyk's own testimony at the ALJ hearing. Although the ALJ did not specifically cite the Polaski factors in determining credibility, he evaluated the relevant factors in determining his credibility.[9] See Holley v. Massanari, 253 F.3d

---

[9] The ALJ stated with regard to determining credibility, "the following factors must be considered: objective medical evidence; the nature, location, onset, duration, frequency, radiation, and intensity of any pain; precipitating and aggravating factors; type, dosage, effectiveness and adverse side effects of any pain medication; treatment, other than medication for relief of pain; functional restrictions; the claimant's daily activities; any measure the claimant uses or has used to relieve pain or other symptoms; and the claimant's prior work record." (Tr. 30).

1088, 1092 (8th Cir. 2001). Soyk testified at the ALJ hearing that he was able to participate in daily activities such as caring for his own personal needs, cleaning the household, preparing meals, operating a computer, reading newspapers and books, shopping, attending family social events, and he attended casinos, dined out, obtained a drivers license, and attended church and Bible study. (Tr. 125-40, 449-55). The ALJ's credibility determination is supported by the claimant's performance of significant daily activities. See Gulliams v. Barnhart, 393 F. 3d 798, 802 (8th Cir. 2005).

In addition, Soyk's own testimony at the ALJ hearing lends credibility to the ALJ's findings. Soyk testified that he had not had a grand mal seizure in "quite a while" and that his medicine "really helped" control his petit mal seizures and decreased the number and severity of his nightmares. (Tr. 434). Soyk has also described his mood as generally fair and denies having any problems with energy. (Tr. 408). He has said that he has no problem with sleep or appetite. Id.

After reviewing the evidence, the ALJ did not improperly weigh the medical evidence and he did not err in discrediting Soyk's testimony. As discussed above, Soyk participated in a myriad of daily activities, his medication was effective in controlling his seizures and nightmares, he is not in any daily pain, and his functional restrictions were determined by most doctors to be either moderate or limited with only a few marked limitations.

As long as substantial evidence in the record supports the ALJ's decision, a court may not reverse it either because substantial evidence exists in the record that would have supported a contrary outcome, or because this court would have decided the case differently. Holley v. Massanari, 253 F.3d at 1091.

After reviewing the totality of the evidence, the ALJ did not err in discrediting Soyk's contention that he was disabled. See Burns v. Sullivan, 888 F.2d 1218, 1219 (8th Cir. 1989).

29

**IV.**     **CONCLUSION AND RECOMMENDATION**

Based on the foregoing, it is hereby **RECOMMENDED** that:

1.     Defendant's motion for summary judgment (Docket No. 8) be granted and plaintiff's

motion for summary judgment (Docket No. 10) be denied.

**NOTICE OF RIGHT TO FILE OBJECTIONS**

Pursuant to Local Rule 72.1(E)(4), any party may object to this recommendation within

ten (10) days after being served with a copy of this Report and Recommendation.

Dated this 11th day of July, 2006.

                                        /s/ Charles S. Miller, Jr.
                                        Charles S. Miller, Jr.
                                        United States Magistrate Judge